UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                      :

EM LTD. and NML CAPITAL, LTD.,         :

                *Plaintiffs*,   :

        - against -       :

BANCO CENTRAL DE LA REPÚBLICA  :
ARGENTINA and THE REPUBLIC OF  :
ARGENTINA,               :

               *Defendants*.  :

-----------------------------------------------------------------X
(Additional case captions on next two pages)  :
-----------------------------------------------------------------X

06 Civ. 7792 (TPG)

**BANCO CENTRAL DE LA REPÚBLICA ARGENTINA'S REPLY IN FURTHER
SUPPORT OF CROSS-MOTION TO VACATE AND QUASH ALL *EX PARTE* ORDERS**

Joseph E. Neuhaus
Laurent S. Wiesel
Michael J. Ushkow
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
(212) 558-4000

*Attorneys for Banco Central
de la República Argentina*

May 21, 2010

```
-----------------------------------------------------------X
VARIOUS ACTIONS                          :    02 Civ. 1773 (TPG)
                                         :    02 Civ. 3804 (TPG)
                                         :    02 Civ. 3808 (TPG)
                                         :    02 Civ. 4124 (TPG)
                                         :    03 Civ. 1680 (TPG)
                                         :    03 Civ. 2507 (TPG)
                                         :    03 Civ. 4693 (TPG)
                                         :    03 Civ. 6268 (TPG)
                                         :    03 Civ. 8120 (TPG)
                                         :    03 Civ. 8845 (TPG)
                                         :    03 Civ. 9538 (TPG)
                                         :    04 Civ. 3314 (TPG)
                                         :    04 Civ. 6137 (TPG)
                                         :    04 Civ. 6594 (TPG)
                                         :    04 Civ. 7504 (TPG)
                                         :    05 Civ. 177 (TPG)
                                         :    05 Civ. 178 (TPG)
                                         :    05 Civ. 2434 (TPG)
                                         :    05 Civ. 2943 (TPG)
                                         :    05 Civ. 3089 (TPG)
                                         :    05 Civ. 3955 (TPG)
                                         :    05 Civ. 4085 (TPG)
                                         :    05 Civ. 4299 (TPG)
                                         :    05 Civ. 4466 (TPG)
                                         :    05 Civ. 5197 (TPG)
                                         :    05 Civ. 6002 (TPG)
                                         :    05 Civ. 6200 (TPG)
                                         :    05 Civ. 6599 (TPG)
                                         :    05 Civ. 8195 (TPG)
                                         :    05 Civ. 8687 (TPG)
                                         :    05 Civ. 10636 (TPG)
                                         :    06 Civ. 207 (TPG)
                                         :    06 Civ. 3196 (TPG)
                                         :    06 Civ. 3197 (TPG)
                                         :    06 Civ. 3198 (TPG)
                                         :    06 Civ. 6032 (TPG)
                                         :    06 Civ. 6466 (TPG)
                                         :    06 Civ. 7100 (TPG)
                                         :    07 Civ. 98 (TPG)
                                         :    07 Civ. 689 (TPG)
                                         :    07 Civ. 937 (TPG)
                                         :    07 Civ. 1910 (TPG)
                                         :    07 Civ. 2690 (TPG)
                                         :    07 Civ. 2693 (TPG)
```

```
                                        :    07 Civ. 2715 (TPG)
                                        :    07 Civ. 5807 (TPG)
                                        :    07 Civ. 6563 (TPG)
                                        :    07 Civ. 7248 (TPG)
                                        :    07 Civ. 10656 (TPG)
                                        :    07 Civ. 10657 (TPG)
                                        :    07 Civ. 11327 (TPG)
                                        :    07 Civ. 11382 (TPG)
                                        :    07 Civ. 11495 (TPG)
                                        :    07 Civ. 11497 (TPG)
                                        :    08 Civ. 440 (TPG)
                                        :    08 Civ. 2541 (TPG)
                                        :    08 Civ. 3302 (TPG)
                                        :    08 Civ. 4902 (TPG)
                                        :    08 Civ. 5436 (TPG)
                                        :    08 Civ. 6625 (TPG)
                                        :    08 Civ. 6978 (TPG)
                                        :    09 Civ. 1707 (TPG)
                                        :    09 Civ. 1708 (TPG)
                                        :    09 Civ. 8275 (TPG)
                                        :    09 Civ. 8299 (TPG)
                                        :    09 Civ. 8757 (TPG)
                                        :    09 Civ. 10620 (TPG)
-------------------------------------------------------------X
```

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................................1

ARGUMENT .................................................................................................................................5

I.  PLAINTIFFS CONCEDE THAT THE COURT SHOULD VACATE THE *EX PARTE* ORDERS IN ALL RESPECTS EXCEPT FOR THE ALREADY RESTRAINED $100 MILLION AT THE FRBNY .................................5

II.  SATISFYING FSIA REQUIREMENTS IS A JURISDICTIONAL PREREQUISITE FOR VALID ATTACHMENT, RESTRAINING AND EXECUTION ORDERS ........................................................................7

III.  THE FRBNY FUNDS WERE NOT "USED FOR A COMMERCIAL ACTIVITY IN THE UNITED STATES" AS OF THE DATE THE *EX PARTE* ORDERS WERE ISSUED, AND THEREFORE DO NOT SATISFY THE REQUIREMENTS OF THE COMMERCIAL ACTIVITY EXCEPTION ...........................................................................9

    A.  The Relevant Dates for Assessing "Commercial Activity" Under 28 U.S.C. § 1610 Are the Dates on Which the Court Granted the *Ex Parte* Orders................................................................................9

    B.  Complying With The September 28, 2006 Stipulation and Consent Order Is Not "Commercial Use" Under 28 U.S.C. § 1610 .............................12

IV.  THE ATTACHMENTS ARE ALSO DEFECTIVE UNDER NEW YORK LAW ..............................................................................................12

V.  NOTHING ABOUT THE ALTER EGO **"EVIDENCE"** JUSTIFIES GRANTING A SEPARATE ATTACHMENT ON THE ALREADY FROZEN RESERVES ................................................................................14

VI.  THE COURT SHOULD EXERCISE ITS DISCRETION TO VACATE THE *EX PARTE* ORDERS ....................................................16

CONCLUSION.............................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Al-Dohan* v. *Kouyoumjian*,
　　461 N.Y.S.2d 2 (1st Dep't 1983) ………………………………………………………....13

*Allstate Ins. Co.* v. *TMR Medibill Inc.*,
　　No. 00 civ. 0002 (CPS), 2000 WL 34011895 (E.D.N.Y. July 13, 2000) …………….……..14

*Ames* v. *Clifford*,
　　863 F. Supp. 175 (S.D.N.Y. 1994)..………………………………………………….…..8

*Aurelius Capital Partners, LP* v. *Republic of Argentina*,
　　584 F.3d 120 (2d Cir. 2009),
　　*cert. denied*, 130 S.Ct. 1691 (U.S. Mar. 1, 2010) ……………………………………….……7, 11

*Bayer Schera Pharma AG* v. *Sandoz, Inc.*,
　　Nos. 08 Civ. 03710 (PGG), 08 Civ. 08112 (PGG),
　　2010 U.S. Dist. LEXIS 33252
　　(S.D.N.Y. Mar. 29, 2010) ………………………………………………………………...10

*California* v. *Deep Sea Research, Inc.*,
　　523 U.S. 491 (1998)………………………………………………………………………13

*Epperson* v. *Entertainment Express, Inc.*,
　　242 F.3d 100 (2d Cir. 2001)………………………………………………………………14

*Ernst Haas Studio, Inc.* v. *Palm Press, Inc.*,
　　164 F.3d 110 (2d Cir. 1999)………………………………………………………....……10

*Flame S.A.* v. *Primera Mar. (Hellas) Ltd.*,
　　No. 09 Civ. 8138 (KTD),
　　2010 U.S. Dist. LEXIS 9830 (S.D.N.Y. Feb. 2, 2010)...................................…………17

*Frank B. Hall & Co.* v. *Rushmore Ins. Co. Ltd.*,
　　No. 80 Civ. 4976 (RLC),
　　1981 U.S. Dist. LEXIS 11064 (S.D.N.Y. Feb. 20, 1981).....................................……..6

*Graubard Mollen Dannett & Horowitz* v. *Kostantinides*,
　　709 F. Supp. 428 (S.D.N.Y. 1989)..………………………………………………………13

*Great Lakes Carbon Corp.* v. *Fontana*,
　　387 N.Y.S.2d 115 (1st Dep't 1976) .......…………………………………………....…..14

*Guardian Loan Co.* v. *Early*,
　　47 N.Y.2d 515 (1979) ......................................………………………………………16

*Kenyon & Kenyon* v. *Advanced Eng'g Research & Dev. Corp.*,
No. 97 Civ. 5909 (DC),
1998 U.S. Dist. LEXIS 8897 (S.D.N.Y. June 16, 1998) ...........................…………....6

*New York Janitorial Serv., Inc.* v. *Easthampton Dewitt Corp.*,
420 N.Y.S.2d 100 (N.Y. Supr. Ct. 1979)…………………………………..………………6

*NYSA-ILA Pension Trust Fund* v. *Garuda Indonesia*,
7 F.3d 35 (2d Cir. 1993)..……………………………………………………………...7

*Peacock* v. *Thomas*,
516 U.S. 349 (1996)…………………………………………………………………14

*Thadford Realty Co.* v. *L.V. Income Props. Corp.*,
476 N.Y.S.2d 346 (2d Dep't 1984)..……………………………………………………6

### STATUTES

28 U.S.C. § 1609…….............…………………………………….………2, 8

28 U.S.C. § 1610…………………………………………………………2, 7, 8, 9, 11

28 U.S.C. § 1611…………………………………………………………………2, 8, 11

N.Y. CPLR 5234…………………………………………………………………8, 9

N.Y. CPLR 5240…………………………………………………………………16

N.Y. CPLR 6210………………………………………………………………6,7

N.Y. CPLR 6212…………………………………………………………13

N.Y. CPLR 6213…...………………………………………………………13

N.Y. CPLR 6223…………………………………………………………13

### OTHER AUTHORITIES

FAIR VALUE MEASUREMENTS, Statement of Fin. Accounting Standards No. 157
(Fin. Accounting Standards Bd. 2008) ........………………………………….…….16

H.R. 94-1487 (1976),
*reprinted in* 1976 U.S.C.C.A.N. 6604…………… ........…………………….……….8

Banco Central de la República Argentina ("BCRA"), the central bank of the Republic of Argentina (the "Republic" or "Argentina"), respectfully submits this reply, responding to a total of 48 pages of opposition briefing submitted by five groups of plaintiffs, in further support of its March 26, 2010 cross-motion to vacate all *ex parte* orders and quash writs of execution issued between January 11 and 19 and on February 4, 2010 in the actions listed in the caption above (collectively the "2010 *Ex Parte* Orders" or the "*Ex Parte* Orders").[1]

## PRELIMINARY STATEMENT

Plaintiffs have engaged in remarkable flip-flopping in an attempt to salvage something from the clearly improper *ex parte* orders they obtained in January 2010.  First, EM Ltd. ("EM") and NMLCapital, Ltd. ("NML" and together "EM/NML"), proceeding *ex parte*, obtained a broad order against any BCRA property they could find, but specifically disavowed any intent to add an additional, unnecessary layer of attachment on the already-frozen $100 million (the "$100 million" or the "Frozen Reserves") at the Federal Reserve Bank of New York (the "FRBNY").[2]  The remaining plaintiffs sought and obtained essentially identical orders, all resting on EM/NML's arguments.

Then, EM/NML moved to confirm the orders in their entirety, completely backtracking on the representations they made with respect to the $100 million.  In their motion to confirm, EM/NML, joined by all the other plaintiffs, concocted a variety of arguments for why they should be allowed additional attachments on the already-frozen $100 million, but also

---

[1]     BCRA hereby joins in the arguments set forth in the Republic's reply to the Duane Morris and Milberg groups of plaintiffs to the extent that those plaintiffs oppose BCRA's cross-motion to vacate the *Ex Parte* Orders as to BCRA's property.

[2]     *See* EM/NML 1/11/10 Mem. Supp. *Ex Parte* Orders of Attachment and Restraint, and Writs of Execution (No. 06 Civ. 7792 (TPG), DocketNo. 69) ("EM/NML 1/11/10 Mem.") at 1.

insisted that the broad, nonspecific orders should likewise be confirmed.  Now, faced with the

clear impropriety of roving, nonspecific attachment orders and restraints against a sovereign

entity, plaintiffs concede that the orders should be vacated except as to the $100 million, but not

because the orders were wrongful *ab initio*, which they were, but because they are "moot" and

"ineffective."

   As to the $100 million, plaintiffs similarly shift ground on the commercial-use

question, vacillating on whether the relevant date is January 2010, as they argued in seeking the

2010 *Ex Parte* Orders, or December 30, 2005, the date the Court used in its recent opinion on

EM/NML's 2006 attachment motion.  Plaintiffs also assert that the stipulation by which the

money was frozen pending the judicial resolution of the 2006 attachment itself constituted a

commercial use, an argument never before made.

   These wildly shifting arguments and theories signal serious flaws in plaintiffs'

case.  At any rate, there is no significant dispute that the Court should vacate the 2010 *Ex Parte*

Orders to the extent the plaintiffs have conceded that they are invalid and ineffective.  As to the

remainder — the cumulative attachments and restraints and writs of execution on the $100

million — the Court should vacate the Orders because plaintiffs' latest arguments are meritless.

   In particular, plaintiffs first argue that they did not have to meet the requirements

set forth in the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1609, 1610,

1611(b)(1) — such as the commercial-use test — at all in order to obtain an initial *ex parte*

attachment.  This argument is irrelevant now, because plaintiffs do not dispute that the FSIA

tests must be met in order to *maintain* an attachment, or to defeat a motion to vacate, which is the

question now before the Court.  But the argument is in any event contrary to the statute and

Second Circuit precedent.  Likewise, the Aurelius plaintiffs' argument that they did not need to

meet the tests for an attachment, because all they were seeking was to preserve their priority to already attached property, is inconsistent with the very New York statute on which they rely.

The case law is clear that the relevant date for measuring commercial use is the date the Court granted the *Ex Parte* Orders, January 11 and 12, 2010.  EM/NML's argument that the Court should look to the uses of the funds four years before is based on no authority.  It is also inconsistent with the argument on which plaintiffs obtained the Orders and it is inconsistent with their entire theory that the 2010 attachments are based on the *current* alleged alter ego facts, not those addressed in the 2006 attachment motion.  Plaintiffs' new argument that the freezing of the Frozen Reserves pursuant to the 2006 stipulation and consent order constituted a commercial activity is contrary to the terms of the stipulation itself, which provides that it could not be used to bolster any party's legal arguments.  It is also clearly wrong, because the stipulation and consent order were part and parcel of the resolution of the 2006 attachment motion by the United States court, which obviously is not commercial activity by BCRA or the Republic.

Even if plaintiffs could get past the FSIA hurdles, the 2010 attachments do not meet the requirements of New York attachment law.  The EM/NML plaintiffs have not even ventured to explain — and cannot possibly establish — that they have a need for an additional levy on the same property, as the law requires.  The Aurelius plaintiffs argue that all that is required is that they possess a hypothetical cause of action in order to obtain a prejudgment attachment.  Not so.  N.Y. CPLR Article 62 requires that plaintiffs file a summons and complaint within 10 days after the Court granted the *Ex Parte* Orders and serve a summons on BCRA within 60 days of obtaining those Orders.  The Aurelius plaintiffs, indeed all non-EM/NML plaintiffs, fall short on both counts.

On the alter ego question, there is no reason for an additional attachment based on the fact that plaintiffs allege alter ego status as of 2010 rather than as of four years ago. The Court already incorporated the 2010 facts, virtually all of which were part of the record on the 2006 motion, into the opinion on that motion. The only two additional facts do not change the picture in a material way.

Finally, the Court should vacate the *Ex Parte* Orders as a matter of its discretion. Plaintiffs obtained the *Ex Parte* Orders on the express representation that plaintiffs were *not* seeking precisely what they now seek — an additional attachment on funds already frozen for four years under a stipulation intended to preserve the status quo pending the Court's resolution of the 2006 attachment motion. If the Court had been told that this is where the 2010 attachment motions would end up, we submit the Court would not have granted them.

The Court should therefore grant BCRA's motion to vacate the *Ex Parte* Orders in their entirety. In any event, BCRA requests a prompt up or down ruling so as to permit the Second Circuit to hear any appeals therefrom at the same time as BCRA's pending appeal from the April 7, 2010 Opinion (No. 06 Civ. 7792, Docket No. 96) and Order entered on April 19, 2010 (the "April 19, 2010 Order") (No. 06 Civ. 7792, Docket No. 100). Doing so would provide an opportunity for the Second Circuit to render a single, final decision as to the $100 million of BCRA's reserves that have been frozen since December 30, 2005.[3]

---

[3]     As the Court aptly noted during the April 29, 2010 telephonic hearing on plaintiffs' letter-application to stay briefing on BCRA's motion to vacate the *Ex Parte* Orders, "the issues about the [September 2006 attachments and the 2010 *Ex Parte* Orders] are very closely related and should go to the same panel in the Court of Appeals at the same time . . . without any question."  4/29/10 Tr. (No. 06 Civ. 7792, Docket No. 104) at 12:7-10.

-4-

**ARGUMENT**

**I.     PLAINTIFFS CONCEDE THAT THE COURT SHOULD VACATE THE *EX PARTE* ORDERS IN ALL RESPECTS EXCEPT FOR THE ALREADY RESTRAINED $100 MILLION AT THE FRBNY.**

Plaintiffs ask the Court to "vacate as moot all of the 2010 *Ex Parte* Orders except those concerning the BCRA assets previously frozen."  *See* Aurelius' 5/7/10 Mem. in Response to BCRA's Cross-Mot. to Vacate and Quash All *Ex Parte* Orders ("Aurelius 5/7/10 Mem.") at 17; *accord* EM/NML's 5/7/10 Mem. (1) In Further Supp. of Mot. to Confirm *Ex Parte* Attachment Orders Signed on January 11-12, 2010 and (2) In Opposition to Cross-Mot. to Vacate and Quash All Ex Parte Orders Signed on January 11-12, 2010 ("EM/NML 5/7/10 Mem.") at 1, 2 n.3 (joining the Aurelius brief and noting "the *only* orders at issue on the pending motion and cross-motion are those directed to the FRBNY; the remaining orders are void").[4] Although BCRA disagrees as to the rationale, BCRA agrees that the Orders should be vacated, so there is no dispute that the Court should promptly vacate all *Ex Parte* Orders except as to the Frozen Reserves held in BCRA's account at the FRBNY (such account the "FRBNY Account").

Somewhat inconsistently, the Aurelius plaintiffs elsewhere in their brief argue that the Court should make no ruling on the Orders as such, but simply deny both the motion to confirm and cross-motion to vacate as moot except to the extent of the Frozen Reserves. Aurelius 5/7/10 Mem. at 3.  They argue that their concession that the Orders are invalid renders any ruling from this Court merely advisory.  To the contrary, BCRA is entitled to a ruling on its

---

[4]     The remaining plaintiffs likewise have joined the Aurelius brief.  The Duane Morris and Milberg plaintiffs have agreed to such vacatur of the Orders insofar as they reach BCRA's property, but not in certain other respects that will be addressed in the Republic's reply brief.  The only exception is that Duane Morris argues in a footnote that vacatur should await the return of certain additional garnishee statements.  This argument is clearly improper under New York law as set forth in the Republic's May 21, 2010 reply at 1-2.

motion to vacate the *Ex Parte* Orders.  There is nothing advisory about vacating orders that actually exist, are overbroad and have had the actual effect of disrupting BCRA's central banking operations despite their lack of validity.  *See* BCRA's 3/26/10 Mem. (1) In Opposition to Plaintiffs' Mot. to Confirm Attachment Orders and (2) In Support of Cross-Mot. to Vacate and Quash All *Ex Parte* Orders (No. 06 Civ. 7792, under seal) ("BCRA 3/26/10 Mem.") at 24 (describing actual disruptions the *Ex Parte* Orders caused to BCRA's central banking operations).

Indeed, it is precisely *because* the *Ex Parte* Orders are void or invalid that the Court must grant BCRA's motion to vacate.  *See*, *e.g.*, *Kenyon & Kenyon* v. *Advanced Eng'g Research & Dev. Corp.*, No. 97 Civ. 5909 (DC), 1998 U.S. Dist. LEXIS 8897, at *8 (S.D.N.Y. June 16, 1998) ("The court must vacate a void judgment or order.").  It is not uncommon, in fact, for courts to vacate on motion an attachment order that a plaintiff concedes is void.  *See*, *e.g.*, *New York Janitorial Serv., Inc.* v. *Easthampton Dewitt Corp.*, 420 N.Y.S.2d 100, 101 (N.Y. Supr. Ct. 1979) ("Plaintiff concedes that . . . attachment orders are void . . .and defendants' motions to vacate are granted in that respect."); *see also Thadford Realty Co.* v. *L.V. Income Props. Corp.*, 476 N.Y.S.2d 346, 348 (2d Dep't 1984) (permitting and granting motion to vacate a void attachment order).

Further, the *Ex Parte* Orders are treated under federal law as "equivalent" to "temporary injunction[s] granted without prior notice and hearing."  *Frank B. Hall & Co.* v. *Rushmore Ins. Co. Ltd.*, No. 80 Civ. 4976 (RLC), 1981 U.S. Dist. LEXIS 11064, at *6 (S.D.N.Y. Feb. 20, 1981) ("[U]nder federal law the order, issued pursuant to CPLR § 6210, is properly to be regarded as a temporary restraining order within the ambit of Rule 65(b), notwithstanding its use in relation to plaintiff's motion for an attachment.").  Such remedies are intended to last for a

-6-

limited time only, and BCRA is entitled to an order from the Court confirming that the *Ex Parte* Orders have now expired.  *See id.*, at *7 (court granted defendant's motion to confirm the expiration of *ex parte* order issued pursuant to N.Y. CPLR 6210).

## II.      SATISFYING FSIA REQUIREMENTS IS A JURISDICTIONAL PREREQUISITE FOR VALID ATTACHMENT, RESTRAINING AND EXECUTION ORDERS.

As for the remaining restraint on the Frozen Reserves, plaintiffs contend that they did not need to satisfy the FSIA's requirements in order to obtain the *Ex Parte* Orders.  They argue that legal issues under the FSIA are "simply part of the Court's determination of the merits of the attachment motion" and do not preclude the Court from establishing jurisdiction over the property while it adjudicates the attachment motion.  Aurelius 5/7/10 Mem. at 12.

The argument is wrong, as set forth below, but in any case makes no sense at this stage.  The motions to confirm or vacate the *Ex Parte* Orders are precisely when the Court must adjudicate the merits of the attachment motion.  Whether or not the plaintiffs had to meet the FSIA requirements — notably, the commercial-use test — at the time they sought the *Ex Parte* Orders, there is no dispute that they must do so now.

In any event, plaintiffs' argument is inconsistent with the text of the FSIA and Second Circuit law.  Under the FSIA, an order is required prior to any attachment or execution of a foreign sovereign's property.  *See* 28 U.S.C. § 1610(c) ("No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution . . . .").  In order to issue any such order, a court "must, as a threshold matter, find an exception to the FSIA's grant of sovereign immunity." *NYSA-ILA Pension Trust Fund* v. *Garuda Indonesia*, 7 F.3d 35, 39 (2d Cir. 1993).  *Accord Aurelius Capital Partners, LP* v. *Republic of Argentina*, 584 F.3d 120, 129-30 (2d Cir. 2009) (the property that is subject to attachment or execution "must have been 'used for a commercial activity' *at the time* the writ of

attachment or execution is issued" (emphasis in original)), *cert. denied*, 130 S.Ct. 1691 (U.S. Mar. 1, 2010).

Plaintiffs' argument that the Court can take jurisdiction over sovereign property without meeting the tests for attachment set forth in the FSIA is in direct conflict with explicit FSIA legislative history: "it should be pointed out that neither Section 1610 nor 1611 would permit an attachment for the purpose of obtaining jurisdiction over a foreign state or its property. For this reason, section 1609 has the effect of precluding attachments as a means for commencing a lawsuit." H.R. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6625.

In a variation of this argument, the Aurelius plaintiffs argue that they do not need to meet the FSIA commercial-activity test if all they are seeking is priority with respect to previously attached property. Indeed, they maintain that under the New York statute that deals with "[p]riority among execution creditors," CPLR 5234(b), they did not have to "attach" or "levy" upon any particular property at all, but could have just "deliver[ed] an order or ma[d]e a demand" on the sheriff. Aurelius 5/7/10 Mem. at 7-9. This argument is baseless. By its terms, N.Y. CPLR 5234(b) only applies "where two or more executions or orders of attachment are issued against the same judgment debtor or obligor." As set forth above, the only way for the Aurelius plaintiffs to obtain an "execution[] or order[] of attachment" against the property of a sovereign entity is to obtain an order under the FSIA. That is why plaintiffs sought court-ordered restraining notices and writs of execution, rather than simply issuing them themselves under the relevant provisions of the CPLR or delivering a "demand" upon a sheriff.[5] In short,

---

[5]     While New York law provides a mechanism for sorting out multiple attachments that may have been laid, attempting to preserve priority is not a proper purpose to obtain duplicative attachments. *Ames* v. *Clifford*, 863 F. Supp. 175, 178 (S.D.N.Y. 1994). Plaintiffs offer no response to this point.

N.Y. CPLR 5234(b) is irrelevant in the absence of a validly issued order of attachment or writ of execution.

**III.    THE FRBNY FUNDS WERE NOT "USED FOR A COMMERCIAL ACTIVITY IN THE UNITED STATES" AS OF THE DATE THE *EX PARTE* ORDERS WERE ISSUED, AND THEREFORE DO NOT SATISFY THE REQUIREMENTS OF THE COMMERCIAL ACTIVITY EXCEPTION.**

    **A.    The Relevant Dates for Assessing "Commercial Activity" Under 28 U.S.C. § 1610 Are the Dates on Which the Court Granted the *Ex Parte* Orders.**

EM/NML contend that, in the context of resolving the 2010 motions, the relevant date for determining whether the Frozen Reserves were used for a commercial activity in the United States under Section 1610 is December 30, 2005, because that is the date the Court used for the analysis in connection with the "September 2006 Motion."  *See* EM/NML 5/7/10 Mem. at 14-15.  This position confuses the relevant procedural history, is inconsistent with the position EM/NML took in moving to confirm and with their overall theory on this motion, and in any case is wrong as matter of law.

In September 2006, EM/NML entered into a Stipulation and Consent Order with BCRA and the Republic pursuant to which BCRA's already frozen reserves would remain at the FRBNY pending this Court's adjudication of whether EM/NML were entitled to attach those funds on an alter ego theory.  The consent order provided, "Should this Court grant the [September 2006 Motion], *the previous attachment* (and all priority obtained thereby) *shall continue to apply* to the [Frozen Reserves]."  September 28, 2006 Stipulation and Consent Order (the "September 2006 Consent Order") ¶ 2 (emphasis added).  The Court has interpreted that Consent Order as EM/NML's application for attachment and restraints against the Frozen Reserves as of December 30, 2005, and has ruled on that application.  *See* April 7, 2010 Opinion, at 7-9 (describing the nature of the September 2006 Motion).

Presently before the Court is an entirely different set of orders.  EM/NML obtained *ex parte* on January 11 and 12, 2010 (followed by the balance of plaintiffs currently holding 2010 *Ex Parte* Orders).  The parties, including EM/NML, then entered into a Stipulation and Consent Order dated January 15, 2010 (the "January 2010 Consent Order") that provided only that any priority rights that the plaintiffs may have validly obtained "as of December 30, 2005, January 11, 2010 and/or January 12, 2010" would be preserved with respect to the Frozen Reserves.  January 2010 Consent Order ¶ 4.

Consistent with the January consent order, plaintiffs maintained until the *reply* briefs on their motion to confirm that the relevant date for the commercial-use analysis is January 2010.  The *Ex Parte* Orders were obtained based on express assertions that the property attached was being used for commercial purposes *at that time*.  *See* EM/NML 1/11/10 Mem. at 31.  In their motions to confirm, plaintiffs argued, "This new motion, which is based on the Central Bank's current alter-ego status and *current commercial use* of the BCRA Accounts, is separate from Plaintiffs' pending motion involving the Central Bank's alter-ego status as of December 30, 2005 and commercial use of the frozen $100 million on that date."  EM/NML 1/19/10 Mem. Supp. Mot. To Confirm Attach. (No. 06 Civ. 7792, Docket No. 75) at 3-4 (emphasis added).  It is black-letter law that plaintiffs cannot raise a new theory in a reply brief. *See*, *e.g.*, *Ernst Haas Studio, Inc.* v. *Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) ("[N]ew arguments may not be made in a reply brief and we decline to entertain the theories so proffered" (internal citation omitted).); *Bayer Schera Pharma AG* v. *Sandoz, Inc.*, Nos. 08 Civ. 03710 (PGG), 08 Civ. 08112 (PGG), 2010 U.S. Dist. LEXIS 33252, at *24 (S.D.N.Y. Mar. 29, 2010) (same).

Moreover, using the December 2005 date would be fundamentally inconsistent with plaintiffs' position that the alter ego inquiry should be made as of January 2010.  *See*, *e.g.*, EM/NML 5/7/10 Mem. at 3 ("The January 2010 Confirmation Motion is based on a legal theory separate from those on which the December 2005 Litigation and the September 2006 Motion were premised," and presents the issue "whether BCRA was an alter ego of Argentina *as of January 11, 2010*" (emphasis in original)).  Plaintiffs cannot have it both ways — that they are entitled to duplicative attachments on the grounds that plaintiffs are presenting facts as of a different time period from the earlier attachment, but then rely on the grounds on which that earlier attachment was based.

In any event, the Second Circuit has declared in no uncertain terms that for Section 1610 to apply, "the property that is subject to attachment and execution must be 'property in the United States of a foreign state' *and* must have been 'used for a commercial activity' *at the time* the writ of attachment or execution is issued."  *Aurelius*, 584 F.3d at 130 (emphases in original).[6]

---

[6]     EM/NML's position on commercial use highlights why it is important that any ruling on the present motions is available on appeal to the Second Circuit at the same time as the 2006 attachment order.  To the extent plaintiffs rest on the December 2005 use for purposes of the commercial-use analysis, the Second Circuit's ruling on that question will enable the Second Circuit to dispose of all orders at once.

Likewise, plaintiffs entirely rely on this Court's April 7, 2010 Opinion granting the 2006 attachment motion with respect to BCRA's arguments that the *Ex Parte* Orders are invalid (i) under the central bank/monetary authority exemption of the FSIA, 28 U.S.C. §1611(b)(1), and (ii) because the Court lacks jurisdiction to issue post-judgment relief on an alter ego theory.  *See* EM/NML 5/7/10 Mem. at 3, 14; Aurelius 5/7/10 Mem. at 17. BCRA respectfully maintains that both rulings were erroneous.  Here, too, in the interests of judicial efficiency, the Second Circuit should be permitted to rule at the same time on the same issues with respect to both sets of orders.

**B.      Complying With The September 28, 2006 Stipulation and Consent Order Is Not "Commercial Use" Under 28 U.S.C. § 1610.**

Plaintiffs argue that BCRA was using the Frozen Reserves "for commercial activity on January 11, 2010 by using those funds as security on [EM/NML's] September 2006 Motion."  EM/NML 5/7/10 Mem. at 15-16; *accord* Aurelius 5/7/10 Mem. at 9-10.  They argue that the stipulation was analogous to "the posting of funds by a party as security for a potential monetary liability," which they characterize as a commercial activity.  *Id.* at 10.  The September 2006 Consent Order, however, expressly states that the continued stay of the vacatur would not affect in any way the rights of the parties:

> The entry of this Stipulation and Consent Order will have no effect on the legal positions of the parties . . . with respect to any right of Plaintiffs to attach or execute upon any property of the Central Bank or of Argentina, and no party may rely upon this Stipulation and Consent Order in support of an argument for or against the existence of any such right or an argument about the use or ownership of the Attached Property.

September 2006 Consent Order ¶ 3.  Thus, the Court should reject this commercial-activity argument because it violates this Court's order.

Further, the argument that the stipulation was a "commercial activity" is contrary to the facts.  The September 2006 Consent Order was an interim resolution of what BCRA maintains is a wrongful attachment.  It was entered at the Court's urging in order to permit a sovereign central bank to conduct necessary monetary functions while giving the courts time to consider the EM/NML's attachment motion.  This is not commercial activity.  It is an artifact of the U.S. judicial system.

**IV.      THE ATTACHMENTS ARE ALSO DEFECTIVE UNDER NEW YORK LAW.**

Even if plaintiffs overcome the presumption that the Frozen Reserves are immune under the FSIA, plaintiffs have not and cannot satisfy the statutory requirements under CPLR Part 62.  EM/NML have not even attempted an explanation as to any possible need for

-12-

continuing the levy on the Frozen Reserves in light of the Court's April 7, 2010 Opinion granting EM/NML rights to attach those very same reserves.  *See* NY CPLR 6223 ("[P]laintiff shall have the burden of establishing . . . the need for continuing the levy . . . .").

   The Aurelius plaintiffs, for their part, argue that they do not need to have actually served and filed a summons and complaint in order to sustain an attachment; they merely had to have a "cause of action."  Aurelius 5/7/10 Mem. at 15.  But the Aurelius plaintiffs simply ignore the requirements of New York law set forth in our opening brief:  under the CPLR, a party seeking to lay a prejudgment attachment must (i) "file a summons a complaint" "within 10 days after" the Court granted the *Ex Parte* Orders, N.Y. CPLR 6212(c); and (ii) serve the summons on BCRA "within 60 days after" the Court granted those Orders, N.Y. CPLR 6213.  Otherwise, a party could obtain an open-ended prejudgment attachment against a foreign sovereign's assets with no set process for resolving the matter.  The Aurelius plaintiffs failed to satisfy either requirement.  *See Graubard Mollen Dannett & Horowitz* v. *Kostantinides*, 709 F. Supp. 428, 431 (S.D.N.Y. 1989) (vacating attachment because plaintiff failed to serve summons within CPLR time limit); *Al-Dohan* v. *Kouyoumjian*, 461 N.Y.S.2d 2, 4 (1st Dep't 1983) (failure to serve the summons was "a jurisdictional defect which rendered the attachment void *ab initio*").

   The Aurelius plaintiffs cite two cases that they claim stand for the proposition that a separate complaint is unnecessary to attach assets of an alleged alter ego.  Aurelius 5/7/10 Mem. at 16.  But these cases are not cases in which the plaintiffs sought alter ego declarations against a nonparty.  They are forfeiture cases in which a creditor is seeking to trace proceeds of wrongdoing into the hands of third parties.  In such cases, whether the court has jurisdiction over the owner of the property is irrelevant — the court's jurisdiction over the property itself is sufficient.  *See California* v. *Deep Sea Research, Inc*., 523 U.S. 491, 501 (1998).  Thus, in

*Allstate Ins. Co.* v. *TMR Medibill Inc.*, No. 00 civ. 0002 (CPS), 2000 WL 34011895 (E.D.N.Y. July 13, 2000), the court expressly held that the property in the hands of the non-parties consisted of proceeds from the defendants' fraudulent scheme. *Id.* at *13-16 ("the evidence shows a significant flow of money from" defendants to the non-parties during the fraudulent scheme). In *Great Lakes Carbon Corp.* v. *Fontana,* 387 N.Y.S.2d 115, 116 (1st Dep't 1976), the court permitted attachment against a wife's bank account into which the named husband-defendant transferred the proceeds of his fraudulent scheme.[7]

These cases are the reverse of the present case. In this case, plaintiffs are not arguing that the Republic secrets proceeds of fraud in the hands of BCRA. They argue in fact that the Republic *takes* assets *from* BCRA. Where, as here, plaintiffs assert an alter ego theory to attempt to shift liability to a new party, the law is clear that a separate basis for jurisdiction — supported by a summons and complaint — is required. *See Peacock* v. *Thomas*, 516 U.S. 349, 357 (1996); *Epperson* v. *Entertainment Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001); *see also* BCRA 3/26/10 Mem. at 13-17.[8]

## V.   NOTHING ABOUT THE ALTER EGO "EVIDENCE" JUSTIFIES GRANTING A SEPARATE ATTACHMENT ON THE ALREADY FROZEN RESERVES.

Plaintiffs acknowledge that virtually all of the "evidence" upon which they rely for their 2010 attachment arguments was in the record on the 2006 attachment motion. *See*

---

[7]   In any case, in *Great Lakes*, the plaintiff in fact had moved to amend the complaint to assert claims against the wife, so there was a complaint on file within the statutory time. 387 N.Y.S.2d at 116.

[8]   The Aurelius plaintiffs also rely on this Court's April 7, 2010 Opinion on EM/NML's September 2006 Motion as precedent for their attempt to obtain *post-judgment* restraints. *See* Aurelius 5/7/10 Mem. at 17. BCRA disagrees with that opinion on this point, and the Court's order is under appeal. But the EM/NML action is distinguishable, because EM/NML had at least filed a complaint naming BCRA as a party (albeit one over which we submit the Court lacks jurisdiction).

EM/NML 5/7/10 Mem. at 4-5.  Plaintiffs also recognize that the Court in its April 7, 2010

Opinion relied on those events in support of granting that motion and found "a pattern of

behavior."  *Id.* at 4.  While BCRA disagrees with those conclusions, that opinion is now on

appeal, and there is no justification or need for the Court to confirm a new attachment based on

the same facts already addressed in the prior order.  Contrary to EM/NML's argument that the

2010 attachment motions rely on "a different theory from that supporting the September 2006

Motion," EM/NML 5/7/10 Mem. at 17, the theory is fundamentally the same as what was argued

on the prior motion and the Court has already considered and ruled on it.

   The only new alleged facts on the present motion are immaterial to plaintiffs'

case.  First, plaintiffs point to the fact that the Argentine National Senate passed a bill that, if

enacted into law after passage in the lower house, would authorize BCRA to loan reserves to the

Executive and void Decree 298.  *Id*. at 8.  This merely shows another instance in which the

Congress — both houses of which are controlled by the political opposition — has supported a

use of reserves that plaintiffs erroneously rely on as evidence of domination of BCRA by the

Argentine Executive.  As the Senate action indicates, the allocation of reserves in this way is a

normal function of a State's political branches.

   Second, plaintiffs point to news reports that, after the Argentina National Senate

confirmed the appointment of the new BCRA Governor, Mercedes Marcó del Pont, Governor del

Pont supposedly approved the amount of BCRA's profits from 2009 that it will transfer to the

Executive in 2010, allegedly nearly 24 billion pesos or USD 6.2 billion.  Plaintiffs put the word

"profits" in quotes and suggest that they are "of questionable legitimacy" and the result of

"creative accounting."  *See id*. at 11-12 & n.12.  Leaving aside the accuracy of the news reports

— in fact, BCRA's Board, not the Governor, approves transfers of profits, *see* BCRA Charter,

arts. 14(f), 38 (attached to the 5/7/10 Supp. Decl. of Suzanne M. Grosso, Exh. 5), and the Board has not yet done so — the transfer of central bank profits to the Government is old news that the parties have briefed at length.  Like the Fed, BCRA has always transferred a portion of its profits to the Government.

In 2009, BCRA's profits have increased compared to prior years, but not due to "creative accounting."  Rather, EM/NML's own newspaper articles attribute the high 2009 profits "primarily due to increases in the value of public securities" — that is, the rise in the prices of government bonds on the secondary market.  5/7/10 Grosso Decl. Exh. 12; *see also* 5/7/10 Grosso Decl. Exh. 13 ("Central bank profits, which aren't part of the institution's $47.8 billion in reserves, result from gain in investments and the effects of a weakening peso.").  But this just means that BCRA's investment in Argentine government bonds was a good one.  A rise in the market value of a bank's assets such as publicly tradable government securities will automatically result in an increase in reportable income and profits under fair value or mark-to-market accounting.  This is hardly "creative accounting."  It is the norm in the United States.  *See generally* FAIR VALUE MEASUREMENTS, Statement of Fin. Accounting Standards No. 157, ¶ 7 (Fin. Accounting Standards Bd. 2008).

## VI.   THE COURT SHOULD EXERCISE ITS DISCRETION TO VACATE THE *EX PARTE* ORDERS.

Even if plaintiffs had not conceded that the *Ex Parte* Orders should be vacated (except as to the Frozen Reserves), and even if vacating those concededly void orders to that extent was not required as a matter of law, the Court should exercise its discretion to vacate the Orders so as to avoid any possible further confusion.[9]

---

[9]   The Court has discretion to vacate all of the attachments and restraints, whether pre- or post-judgment.  *See, e.g.*, *Guardian Loan Co.* v. *Early*, 47 N.Y.2d 515, 519 (1979) (N.Y. CPLR 5240 "grants the courts broad discretionary power to control and regulate the

As to the already frozen reserves, EM/NML have shown no need for a duplicative attachment.  Indeed, they obtained the *Ex Parte* Orders on false pretenses, explicitly representing when they appeared *ex parte* before Court that they were *not* seeking precisely the relief to which the Orders are now reduced.  The other plaintiffs obtained their orders on precisely the same representations, because they all simply incorporated the EM/NML arguments.

Thus, in granting *ex parte* relief the Court was not told that the orders were pile-on orders, sought four years after the fact, that would open months of lengthy briefing and complicate these proceedings and the appeal from the 2006 attachment motion, on which the Court had worked for four years.  Parties must be punctilious and forthright in obtaining *ex parte* relief.  It will not do to present one theory in getting the *ex parte* orders and then reverse course and argue for something different when the affected party shows up and demonstrates that the relief originally sought and obtained was clearly improper.  Even if the Orders were otherwise proper under the law – contrary to all of the foregoing – the Court should vacate the *Ex Parte* Orders as a matter of discretion.

---

enforcement of a money judgment under article 52 to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts" (internal citations omitted)); *Flame S.A.* v. *Primera Mar. (Hellas) Ltd.*, No. 09 Civ. 8138 (KTD), 2010 U.S. Dist. LEXIS 9830, at *10 (S.D.N.Y. Feb. 2, 2010) ("[T]he granting of a prejudgment attachment order is discretionary, 'and even when the statutory requisites are met, the order may be denied'" (citation omitted).).

**CONCLUSION**

The Court should grant BCRA's motion to vacate the 2010 *Ex Parte* Orders.


Dated:  New York, New York
        May 21, 2010

                            _/s Joseph E. Neuhaus_____
                            Joseph E. Neuhaus
                            Laurent S. Wiesel
                            Michael J. Ushkow
                            SULLIVAN & CROMWELL LLP
                            125 Broad Street
                            New York, New York  10004
                            Tel.:    (212) 558-4000

                            *Attorneys for Banco Central de la*
                            *República Argentina*

-18-